GRAHAM & ZENGER, INC., ET AL. *v.* UNITED STATES

No. 4368.—Invoices dated Frauenau, Germany, January 19, 1934, etc.
Certified January 23, 1934, etc.

Entered at New York February 5, 1934, etc.
Entry No. 47012, etc.

(Decided July 18, 1938)

*Pickrell & McDonald (Eugene R. Pickrell* of counsel) for the plaintiffs.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Dorothy C. Bennett,* special attorney), for the defendant.

SULLIVAN, Judge: The merchandise involved in these appeals to reappraisement consists of certain glassware manufactured by Krystallglasfabrik Frauenau, and imported by these plaintiffs from Germany between January 1934 and July 1937.

Counsel for plaintiffs stated at the trial:

The blown glass tableware was appraised on alleged foreign market value, and advanced in value of from 20 to 80 per cent. * * * We are contending for export value, that is with one exception. There are about nine items out of one hundred, where it is also foreign market value.

Plaintiffs' witness Schabmayr testified at the trial that since 1912 he has been employed by Graham & Zenger and Black Knight China, importers of china and glassware; that he is a German, and has translated documents from the German language into the English language, and vice versa. A document purporting to be an affidavit with invoices attached thereto in the German language was handed the witness, and he testified he translated the same into the English language. The translation was also handed to him, and he testified it is "a true and correct version in the English language of the affidavit and appended invoices in the German language."

The affidavit and translation referred to were received in evidence as Collective Exhibit 1.

The witness testified he has made since 1920 six or seven trips to Germany "to visit the factories we buy from", and he visited the factory manufacturing and shipping this merchandise "on every trip"; that he supervised the purchase of this merchandise; that the plaintiffs in this case are the buyers and Krystallglasfabrik Frauenau are the sellers of this merchandise; that he supervised the payment of the bills for the merchandise covered by these reappraisements, and that the same has been paid for; that the prices paid therefor were "the invoiced prices"; that there is no exclusive buying or selling agreement between the manufacturers and these plaintiffs.

On cross-examination he testified that this glassware was not an exclusive pattern or design reserved for the plaintiffs, and the plaintiffs have not exclusive rights with respect to this particular type of glassware; and that he was in Germany in May and June 1935, and not in 1934, 1936, and 1937.

The Government introduced in evidence as Exhibit 2, special agent's report of Walter M. Wolff, dated May 5, 1934; as Exhibit 3 a second report dated December 3, 1934, with drawings and prices attached; also as Exhibit 4 a further report of Mr. Wolff, dated August 20, 1935.

Exhibit 1 is the affidavit of J. Gistl of Frauenau, Bavaria, Germany. He states that from January 1, 1934, until date (December 6, 1937) he was the owner of Krystallglasfabrik Frauenau, Germany, a company organized and existing under the laws of Germany, and during that time "supervised all sales of blown glass tableware" sold by his concern "both for domestic consumption in Germany" and for export to the United States and other countries "with the exception of the time from November 14, 1934, until February 18, 1935, during which time I was ill and was kept informed by reports about the current business"; that from January 1, 1934, to the date of the affidavit, December 6, 1937, his concern "has sold blown glass table ware in wholesale quantities for domestic consumption in Germany * * * without any restrictions or limitations to all purchasers in Germany in wholesale quantities" the same "as *some* of the blown glass tableware" sold by his concern to these plaintiffs in New York.

He then lists nine items with the price of each in reichsmarks, and states that they "are the net prices f. o. b. plant, packing included, at which blown glass table ware was sold by the Krystallglasfabrik Frauenau in Germany without any restrictions or limitations to all purchasers in wholesale quantities during the time from January 1, 1934, until today, which blown glassware is the same or similar as the table ware sold" by his concern to these plaintiffs at New York.

I have examined the invoices in each of these reappraisements, and find the following of these nine items on the invoice with reappraisement 112210–A:

Ant/1 Roemer antikgreen, plain _____ RM— . 45. 3
530/R Roemer corner optic, cut stem _____ . 37

The invoice prices of these two items in reappraisement 112210–A are 0.50 reichsmark and 0.38 reichsmark, respectively, or a trifle more than the prices stated in the above list.

I have examined each of the invoices in the other thirty-odd reappraisements, and do not find the other seven items listed in Exhibit 1, thereon.

Copies of invoices of the sales referred to in Exhibit 1 and "paper cuts" of the nine articles heretofore referred to are attached to Exhibit 1.

Deponent lists in paragraph 11 of Exhibit 1 glassware sold to these plaintiffs which his concern does not sell either for home consumption in Germany or for export to countries other than the United States. Therefore, some of these articles appear to be exclusive to the plaintiffs, and not sold either in Germany or for export.

As to the usual wholesale quantity for export to the United States he states it varies from 24 to 300 pieces of each number, or the same as for domestic consumption.

He testified that the relations between his concern and these plaintiffs "in connection with the purchase and sale of blown glass table ware during the period from January 1, 1934, until the date of the signing of this Declaration were those of seller and purchaser," and that the plaintiffs "had no exclusive sales agreement" with his concern during that time.

He states that his concern "would have sold blown glass table ware" during the period heretofore mentioned "to all purchasers *for export* [italics mine] to the United States of America, at prices corresponding to the prices at which the same blown glass table ware was sold to Graham & Zenger, Inc., New York, N. Y., and to the Black Knight China, Inc., New York, N. Y.," the plaintiffs herein; and that Frauenau, Bavaria, "is a principal market of Germany for blown glass table ware sold for home consumption in Germany" the same as that referred to in the affidavit, and for export to the United States of blown glass table ware the same as that sold to these plaintiffs. Copies of invoices are attached to the affidavit.

I have been able to find but few of the numbers listed on the attached invoices of sales to Germany on the invoices at bar. The prices of those found, which appear to correspond in item numbers to those of the same number on the invoices attached to the affidavit, are slightly lower than those shown on the invoices at bar. In other words, the prices of those items sold for domestic consumption in Germany, which correspond to those sold to these plaintiffs, appear to be somewhat lower than the prices paid therefor by the plaintiffs, as indicated by these invoices. However, as stated, I have been able to find but few corresponding items. This would indicate that *as to some of these items the home prices are somewhat lower than the prices for export.*

The special agent in Exhibit 2 shows that Treasury Agent Wolff visited on March 12, 1934, the offices of the National German Hollow Glass Manufacturers' Association, Dresden, Germany, and interviewed its general manager. He sets forth information relative to this visit, and appends lists showing prices and other information *"valid only for the German home market."* The "cartel" members, the

manufacturers, "may ask higher prices than those fixed and controlled by the cartel but they may not sell at lower figures." The appended pricelists do not contain the names of articles and item numbers appearing on the invoices at bar, nor has defendant's counsel pointed out to the court whereby I can identify the items on these lists with those at bar.

Special agent's report, Exhibit 3, refers to glassware under consular invoices 394 and 683 (reappraisements 112210–A and 112211–A) also to invoices 1030 and 2673 (reappraisements 112578–A and 112213–A). The information therein is from the books and records of Krystallglasfabrik and from Mr. Alfred Gistl, manager.

Under the head of "Export Value" is the following:

The glass stemware is freely offered to all purchasers for export to the United States. The relationship is that of purchaser and seller only. In some cases the purchaser furnishes his own designs for some of the articles and these are reserved for him and not offered for sale to others.

As to "Prices" the special agent states "there is no price list published for export"; that the prices vary according to the kind of glass and the designs or decorations; and that:

The prices are ex-works. The cost of packing, labor and material, is charged extra at the rate of 5% of the invoice value.

The cases are charged extra at their cost and this varies with the size.

There is a cash discount of 3% allowed for payment within 14 days.

If an f. o. b Hamburg price is desired 10% is added to the ex-factory price to cover the freight and f. o. b charges.

As to the orders placed by these plaintiffs during the latter part of 1933 and early part of 1934, the special agent states:

Consular Invoices #1030 and 2673 (Reappraisements 112578–A and 112213–A) certified at Hamburg February 27 and May 24, 1934, respectively are further shipments. *The prices and the office records agree.* [Italics mine.]

Under the head of "Sales to Others":

There were no sales of similar or identical glassware to others for export to the United States this year according to Mr. Gistl.

The special agent further states:

Stem glassware is freely offered to all purchasers in the German market. *These are mostly standard lines.* According to Mr. Gistl over 50% of their business is with wholesale dealers. [Italics mine.]

\* \* \* \* \* \* \*

The following discounts are allowed:

To large wholesalers _____ up to 20%
Other wholesalers _____ 15%
Department stores and similar concerns _____ 10%
Small purchasers _____ 5%

A cash discount of 2% is allowed for payment within 30 days.
The prices are ex-works \* \* \*.

\* \* \* \* \* \* \*

There is a turnover or home consumption tax of 2% on all sales in the German market. The manufacturer must pay this out of his selling price, it cannot be charged extra. *It is not paid on exports.* [Italics mine.]

As to sales in the home market the special agent stated:

Mr. Gistl stated that they have several thousands designs and that the taste in each country differs, designs which sell in one country have no demand in others. *Consequently it would be practically impossible to find sales in the German market of similar merchandise.* Such sales as were noted were at the list prices less the regular association discounts and ex-works, packing and cases charged extra. [Italics mine.]

The special agent stated that "the relationship between the importer and manufacturer is simply that of purchaser and seller." "Most of the articles sold to Graham & Zenger are especially made for them * * * and will not be sold to others."

The special agent then refers to certain glasses with cut stem, item number 3985. I find glasses bearing this item number on the invoices with reappraisements 112211–A, 112578–A, 112579–A, 112580–A, 112695–A, 112822–A, 112841–A, 113144–A, and 113526–A. In each case the appraised value exceeds the invoiced value about 20 per centum. As to this item number the special agent states:

Mr. Gistl has shown the prices to Graham & Zenger on the sketch and has stated, in writing, that *if* he sold these in Germany he would add 20% to these prices. [Italics mine.]

The "writing" referred to is a letter from Gistl to the special agent, dated July 7, 1934, which, as far as pertinent, is as follows:

There are enclosed herewith a few sketches showing the stemware shipped to Graham & Zenger, New York. The prices marked in ink denote those which Graham & Zenger were paying. The prices marked in pencil at each glass are those which we *obtained* in Germany for the merchandise. *The stemware which we ship to America is up to 22% lower in price than that sold in Germany.* Other assortments are shipped to America at the same prices as obtained in Germany. *We accept such prices for shipments to America as we can get.* Enclosed herewith are sketches of Set 3985. The prices marked on the sketches are those at which we shipped the merchandise to America. *The German prices are 20% higher. We are prepared to sell to America at prices 22% lower than those obtained in Germany.* This percentage does not apply to Graham only, we would sell at the same price to other firms outside of Germany. The Habsburg service is reserved for Graham. The cognac coolers 12/108 and 12/1004 are likewise made for Graham only. [Italics mine.]

This letter is signed "J. Gistl." It evidently refers to invoices 394, 683, 1030, and 2673, certified January 23, February 7 and 27, and May 24, 1934, heretofore mentioned.

The lower prices to the United States on some of the glassware were explained by Mr. Gistl to the special agent as follows:

The prices of some of the designs in cut glassware are higher than the importers can pay and compete with world market prices. *The factory therefore bargains for the best prices obtainable* in order to make the sale. [Italics mine.] This applies

to all purchasers in the United States and other countries. The amount is not fixed only they *will not go lower* than 22% below German prices. Against this they are able to obtain better prices for some lines to offset these so that they average the usual profit of 5 to 7%. This percentage was given by several manufacturers as the usual profit in this line of business.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

&ast; &ast; &ast; Graham & Zenger purchased a number of standard wares at only 12 to 17% discount off the list prices. *Mr. Gistl stated that over 50% of their business in the German market carried 20% discount*, they had to give this to compete with Czecho Slovakian glassware.

On page 6 of the special agent's report is the following:

Mr. Gistl stated that G. & Z. were entitled to 20% discount as large dealers but the factory took the best price which they could obtain.

It is evident from the invoice numbers given by the special agent that the sketches involve merchandise covered by reappraisements 112210–A, 112211–A, 112212–A, 112213–A, and 112668–A although I do not find any of the sketch numbers on 112212–A, 112213–A, and 112668–A. I do not find the two items of Cognac-Schwenker, Nos. 12/108 and 12/1004 on page A of the sketches on any of these invoices. The glasses Romer 1044, 1045, and 1047 appear on invoice 394 with reappraisement 112210–A. The German prices stated on the sketches are the same as the appraised values of these items. Item 1034 also appears on this invoice, and the German price on the sketch is the same as the appraised price. The same is true of Burgunder 1049.

The items of "Service-Habsburg" sketched on the second page (B) of the sketches, are without item numbers. Therefore I cannot ascertain whether they are the same as the "Habsburg" items on invoice 394. The prices are different, and even the appraised prices are lower than those stated on the sketches. It does not appear to be the same merchandise as invoiced.

The "Cocktailglas 1013" and "Tom Collins 1017" I do not find on invoice 394, nor on the other invoices mentioned in Exhibit 3.

The "Service-Habsburg", "Cocktailglas 1013" and "Tom Collins 1017", and the two items of "Cognac-Schwenker" as sketched, are stated by the special agent to be specially made items. They do not appear to be covered by any of these reappraisements, so far as I can ascertain from the invoices and invoice descriptions.

On page C of the sketches appear various items with the German prices about 20 per centum higher than the prices to these plaintiffs. They are described generally as "Service-Habsburg", and all bear the item number 543, followed by the name of the article, such as "Goblet", "Cocktail," "Fingerbowl," etc. I do not find any items on the four invoices mentioned in Exhibit 3 bearing item number 543. However, I do find on invoice 394 (reappraisement 112210–A) several items of "crist Schliff. Habsburg" the invoiced and entered values of which are the same as the prices quoted on the sketches as being the

invoiced prices to the plaintiffs, and the German prices of which are the same as the appraised values.

There are eight sketches of glassware on page D. I have found five of them on invoice 394 (reappraisement 112210–A). As to each of those items the prices to the plaintiffs are the same as the invoiced and entered values, while the German prices are the same as the appraised values in each case and are 20 per centum higher.

On page E there are six sketches. With the exception of one item the plaintiffs' prices thereon are the same as the invoiced and entered values (reappraisement 112210–A), while the German prices are the same as the appraised values. The exception is No. 560/Romer. As to that item the plaintiffs' prices and German prices agree, and the item is invoiced, entered, and appraised at the same value, viz, 0.60 reichsmarks each.

On the last page, F, are nine sketches. I have found six of these on invoice 394 (reappraisement 112210–A). Some are on the invoices with reappraisements 112211–A and 112213–A. In each case the appraised value is the same as the German values on the sketches, while the invoiced and entered values are lower.

Exhibit 4 is the report of Mr. Wolff, Treasury representative, dated at Berlin, Germany, August 22, 1935. I find the following on page 5 thereof:

Inasmuch as nearly all of the table glassware shipped to Messrs. Graham & Zenger, Inc., New York, is specially made to order for the latter, it is exceedingly difficult to find evidence of such or similar merchandise having been offered or sold to dealers in the German home market, my informant (Gistl) stated. Another difficulty is also to be found in the fact that three distinct kinds or qualities of cut glass (Krystall) are produced by the manufacturer at Frauenau. * * * *For export to the United States and other foreign markets, services are almost invariably made to the importer's specifications and although some comparison between this class of merchandise and that produced for home consumption might be possible, same would nevertheless be quite accidental, Mr. Gistl said. [Italics mine.] * * *

In view of the fact that Messrs. Graham & Zenger, Inc., order many innovations in goblets and other service units, the quotations shown under the Association list can rarely be used in determining the American concern's prices as mentioned under the various consular invoices alluded to by the Appraiser. Only in sporadic instances may a comparison between the export quotations and the Association prices * * * be made * * *.

In other words, it would seem from the last portion of the foregoing that the quotations given by the special agent can be used but rarely in determining whether or not plaintiffs' invoice prices are correct. This indicates that most of plaintiffs' glassware is not sold in the German market, and that it was largely guesswork on the part of the appraiser in determining that the home market of "such or similar merchandise" should be about 20 per centum higher than the invoice prices of plaintiffs' merchandise, for the reason that

the Association's pricelist "can rarely be used" in determining whether or not plaintiffs' prices as stated on the consular invoices are correct. It would seem that "such or similar merchandise" to plaintiffs' glassware, is *not* "freely offered for sale to all purchasers in the principal markets of the country from which exported (Frauenau)."

The special agent then sets out three items contained in consular invoices 2673 and 4716, respectively, with the prices on Graham & Zenger's invoices and the minimum association list prices. These invoices are in reappraisements 112213–A and 112212–A, respectively. I quote these items and prices as follows from the report:

| Cons. Inv. No. 2673: | Graham & Zenger price, reichsmarks | Minimum association list price, reichsmarks |
|---|---|---|
| No. 12/106 Sherry | [1] 0. 18 | [2] 0. 20 |
| No. 12/107 Portweinkelche | [1] 0. 19 | [2] 0. 20 |
| Cons. Inv. No. 4716: | | |
| No. 12/124 Cocktail crist. stielschliff verschm | [1] 0. 19 | [2] 0. 20 |

[1] Less 3% cash discount.
[2] Less 5% *usual* trade discount and 2% cash discount.

The invoiced, entered, and appraised values of these items are as follows:

| Reappt. 112213–A, Inv. No. 2673: | Invoiced each, reichsmarks | Entered each, reichsmarks | Appraised each, reichsmarks |
|---|---|---|---|
| Sherry, No. 12/106 | 0. 19 | 0. 19 | 0. 32 |
| Portweinkelche, No. 12/107 | 0. 18 | 0. 18 | 0. 30 |

In each case with 5 per centum added for packing and plus cases.

| Reappt. 112212–A, Inv. No. 4716: | Invoiced each, reichsmarks | Entered each, reichsmarks | Appraised each, reichsmark° |
|---|---|---|---|
| No. 12/124 Cocktails crist. stielschliff | 0. 19 | 0. 19 | 0. 34 |

In each case with 5 per centum added for packing and plus cases.

I find on invoice 5385 with reappraisement 112823–A another item of sherries 12/106 as follows:

150 Sherries Stengelschliff #12/106 Invoiced at RM. 0.23 entered to meet advances at RM. 0.32 and appraised as entered, with 5% added for packing plus cases in each case.

Whether or not this is the same item as that contained under the same number in invoice 2673 is not disclosed. As to two of these items, according to the special agent's figures, with the "5% usual trade discount" deducted there is practically no difference between Graham & Zenger's prices and the minimum association list price. As to sherries 12/106 in invoice 2673, with the discount deducted, Graham & Zenger's price would be about a pfennig lower than the list price.

Then the special agent states:

Virtually all other items mentioned in the foregoing and subsequent consular invoices are specially made to order for Graham & Zenger, Inc. The manufacturer is not obliged to adhere strictly to Association-approved calculations when quoting prices for export assortments, *but Mr. Gistl claimed that his export prices are figured on very nearly the same basis as established by the Association for the inland market.* [Italics mine.]

The special agent then gives as an example items of "strohglas" glasses on invoice No. 5796, which "are not offered or sold in Germany in the regular course of trade", and adds:

* * * but the quotations made to Graham & Zenger, Inc., are based on cost figures which *vary only slightly* from those which would apply if the goods had been made for resale in the domestic market.

The special agent states "an ordinary wholesale dealer in Germany" irrespective of quantity purchases, "is entitled to receive only 15% discount off the factory quotations", excepting as to "a few very large wholesalers" who "are allowed the maximum discount of 20% off factory prices."

It will be observed that in the reappraisements at bar discounts are not claimed by plaintiffs.

To sum up the evidence in this case: The testimony of Mr. Schabmayr shows that the prices paid for this merchandise were the invoiced prices. The affidavit of the manufacturer, Mr. Gistl (Exhibit 1), shows that nine items (two of which are covered by these reappraisements) were sold in Germany in wholesale quantities at the date of these importations, and that a wholesale quantity is from 24 to 300 pieces of each number; that the remainder of the glassware on these reappraisements is exclusive to the plaintiffs *and not sold in the home market of Germany;* that this glassware would have been sold to all purchasers for export to the United States at the same prices as to the plaintiffs; and that Frauenau is the principal market. *This is sworn evidence.* The invoiced prices of the two items out of the nine mentioned by Mr. Gistl, which I have found in these reappraisements, are slightly higher than Mr. Gistl's home prices. The same is true of other items mentioned by Mr. Gistl, which I have found in these reappraisements.

The evidence contained in the special agent's reports is somewhat conflicting. It seems to me the evidence offered by the plaintiffs is more convincing than that of the defendant. The special agent's reports are not entirely in harmony with one another, and, there being such a conflict of all the evidence, I am inclined to believe the plaintiffs have sustained the burden of proof.

The special agent in Exhibit 3 states "There were no sales of similar or identical glassware to others for export to the United States this year" (January to December 1934). "Consequently it would be

practically impossible to find sales in the German market of similar merchandise" to that at bar. The stemware offered in the German market is "mostly standard lines." "Most of the articles sold to Graham & Zenger are especially made for them * * * and will not be sold to others." Then he appends sketches of glassware shipped to these plaintiffs some of which appear on these invoices, with German prices the same as the appraised values. This, despite the statement of the special agent that it "would be practically impossible to find sales in the German market of similar merchandise" to that at bar.

I find in Exhibit 4—"For export * * * services are almost invariably made to the importers' specifications and, although some comparison between this class of merchandise and that produced for home consumption might be possible, *same would nevertheless be quite accidental.*" Also "the quotations shown under the Association list can rarely be used in determining the American concern's prices as mentioned under the various consular invoices alluded to by the Appraiser," "but Mr. Gistl claimed that his export prices are figured on very nearly the same basis as established by the Association for the inland market." Also "the quotations made to Graham & Zenger, Inc., are based on cost figures which vary only slightly from those which would apply if the goods had been made for resale in the domestic market."

It seems to me that the weight of the evidence sustains the plaintiffs' invoice prices.

I therefore hold that with the exception of a few items as to which the invoice prices are slightly in excess of the home market value there is no foreign market for the glassware at bar, and that the values found for this merchandise are export values.

I further hold that the unit invoiced values, plus cases and packing as invoiced, are the correct export values of this merchandise.

Judgment for plaintiffs accordingly.